UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DEREK ORTEGA GONSALEZ

Plaintiff,

v.

BRIGITTE AMSBERRY; DR. BEAMER;
TUNER;[1] FERGUSON,

Defendants.

Case No. 2:18-cv-01839-AC

OPINION AND ORDER

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiff Derek Ortega Gonsalez ("Gonsalez"), a prisoner of the State of Oregon housed at

the Eastern Oregon Correctional Institute ("EOCI") appearing *pro se*, filed this action under 42

U.S.C. § 1983 against a number of employees of the Oregon Department of Corrections

---

[1] Gonsalez named "Correctional Officer Tuner" as a defendant in this lawsuit. However, Gonsalez
failed to serve "Tuner," properly identified as Derek Turner, and Judge Michael H. Simon
dismissed Gonsalez's claims against Turner without prejudice on June 1, 2020.

("Department") alleging the employees violated his rights under the Eighth Amendment to be free from cruel and unusual punishment. Defendants move for summary judgment based on their lack of personal involvement, and on lack of evidence establishing the requisite objective or subjective elements of cruel and unusual punishment and deliberate indifference to medical needs, failure to exhaust administrative remedies, and qualified immunity.

The court finds Gonsalez failed to exhaust his administrative remedies, to allege personal involvement by Amsberry or Dr. Beamer, and to establish the requisite elements of an Eighth Amendment claim. The finds alternatively that Defendants are entitled to qualified immunity. Accordingly, Defendants' motion for summary judgment is granted.[2]

### *Preliminary Procedural Matter*

On August 12, 2019, three days after Defendants filed their motion for summary judgment, the court issued and mailed to Gonsalez a Summary Judgment Advice Notice and Scheduling Order ("SJ Notice"). The SJ Notice advised:

> The defendants have made a motion for summary judgment (Motion for Summary Judgment [40]) by which they seek to have your case dismissed. A motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure will, if granted, end your case.
>
> Rule 56 tells you what you must do in order to oppose a motion for summary judgment. Generally, summary judgment must be granted when there is no genuine dispute of material fact – that is, if there is no real dispute about any fact that would affect the result of your case, the party who asked for summary judgment is entitled to judgment as a matter of law, which will end your case. When a party you are suing makes a motion for summary judgment that is properly supported by declarations (or other sworn testimony), you cannot simply rely on what your complaint says. Instead, you must set out specific facts in depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials, as provided in Rule 56(c),

---

[2] The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

PAGE 2 - OPINION AND ORDER

that contradict the facts shown in the defendants' declarations and documents and show that there is a genuine dispute of material fact for trial. If you do not submit your own evidence in opposition, summary judgment, if appropriate, may be entered against you. If summary judgment is granted, your case will be dismissed and there will be no trial.

(Summ. J. Advice Notice and Scheduling Order, ECF No. 46.) The SJ Notice directed Gonsalez to file his opposition to Defendants' motion for summary judgment within thirty days of the SJ Notice, or on or before September 11, 2019.

Gonsalez filed motions for extensions of time to respond to Defendants' motion on August 26, October 10, and November 14, 2019; and January 16, February 14, and May 29, 2020. Gonsalez missed the July 7, 2020 deadline and did not file his opposition brief until August 24, 2020. In that two-page opposition brief, Gonsalez objected[3] to the entirety of Defendants' motion and relied on the allegations in his October 18, 2018 Complaint for Violation of Civil Rights ("Complaint") as his sole evidence. Consequently, Gonsalez's only evidence in opposition to Defendants' motion is the content of his initial pleading.

Generally, a court is unable to consider a party's complaint when ruling on a summary judgment motion. Here, Gonsalez's Complaint is unverified: it does not contain a sworn statement declaring, under penalty of perjury, the allegations are true and correct in accordance with 28 U.S.C. § 1746. Given this omission, the court cannot treat the Complaint as an affidavit opposing Defendants' summary judgment motion. *See Lew v. Kona Hosp.,* 754 F.2d 1420, 1423 (9th Cir.1985) (a verified complaint may be used as an opposing affidavit under Rule 56 to the extent it expresses personal knowledge of admissible facts but an unverified complaint is insufficient to counter a summary judgment motion supported by affidavits).

---

[3] Gonsalez also objected to the court's denial of his various requests for appointment of counsel as discriminatory based on Gonsalez's inability to fully comprehend the English language.

PAGE 3 - OPINION AND ORDER

Nonetheless, Defendants supported their motion in part with the entirety of Gonsalez's deposition. That exhibit which appears to include the relevant allegations on which Gonsalez relies in opposing Defendants' motion. Thus, the undisputed factual background for the court's ruling comes primarily from Defendants' evidence, which includes Gonsalez's sworn testimony.

## Background

### I. The May 31, 2018 Incident

At the time of the relevant events, Gonsalez was housed in EOCI's disciplinary segregation unit ("Unit") because of his involvement in a fight. (Richmond Decl. dated August 8, 2019, ECF No. 42, ¶ 3.) Inmates housed in the Unit spend approximately twenty-hours a day in their cells. (Ferguson Decl., dated July 26, 2019, ECF No. 41, ¶ 3.) Unit inmates are always escorted with their hands cuffed behind their back for safety and security reasons "unless there is an approval from a high-ranking [Department] official or medical services permitting the inmate to be handcuffed in front." (Ferguson Decl. ¶¶ 3, 4.)

Because the Unit cells lack showers, approximately fifty Unit inmates are escorted daily to the showers. (Ferguson Decl. ¶ 3.) Two groups of two correctional officers escort up to three inmates at one time to the showers. (Ferguson Decl. ¶ 3.) The officers handcuff an inmate behind his back through a small opening in their cell door known as a "cuff port," remove the inmate from his cell, escort him to the showers in the handcuffs, and lock the inmate in an individual shower stall before removing the handcuffs. (Ferguson Decl. ¶ 4.) At the end of the ten-minute shower period, the officers escort the inmate back to his cell, again with his hands cuffed behind his back. (Ferguson Decl. ¶ 4.) "Shower time is a busy, noisy time on the [U]nit" and handcuffs are not always removed immediately upon return to the cell. (Ferguson Decl. ¶ 4.)

On May 31, 2018, officers failed to remove Gonsalez's handcuffs when he was returned to his cell (the "Incident"). (Ferguson Decl. ¶ 5.) Gonsalez entered his cell, positioned his hands in the cuff port, and heard EOCI correctional officer Derek Turner ("Turner") say: "I will be right back, I'm going to go ahead and release the others." (Gonsalez Dep. dated July 23, 2019,[4] 19:6-9, 21:21-22:5.) Gonsalez did not immediately call out for help because Turner walked away to assist other inmates, the Unit was extremely noisy with a lot of people walking through the Unit to and from the showers, and he did not believe anyone would hear him. (Gonsalez Dep. 19:10-25.)

Gonzales, who was able to move around his cell despite being handcuffed, leaned on his bed for about ten minutes and, as the handcuffs got tighter causing pain and preventing him from moving his hands, he started screaming for help. (Gonsalez Dep. 16:15-25, 17:8-10, 20:4-7, 22:15-19.) He laid on his bed and continued to scream for help for about an hour before other inmates joined in, kicking their own cells' doors and "yelling out saying man down." (Gonsalez Dep. 20:18-21:4, 23:5-7.)

Sergeant Israel Richmond ("Richmond") heard other inmates housed on the Unit tell Gonsalez "to hide the cuffs and to not let staff know that they had left him in the handcuffs after returning him to his cell from the shower" and "that he could file a lawsuit over the handcuffing." (Richmond Decl. ¶ 3.)[5] Richmond reported this information to Sergeant Foster, and either he or Sergeant Foster ordered officers to check on Gonsalez. (Richmond Decl. ¶ 3, Attach. 2.) Shortly

---

[4] The Gonsalez deposition is attached in its entirety to the Nordyke declaration dated August 9, 2019, ECF No. 45, as Attachment 1.

[5] Gonsalez testified other inmates encouraged him to file a grievance while they were "screaming" at the officers. (Gonsalez Dep. 37:2-6.)

PAGE 5 - OPINION AND ORDER

thereafter, several officers, including Ferguson, reported to Gonsalez's cell to remove the handcuffs through the cuff port. (Ferguson Decl. ¶ 5; Gonsalez Dep. 17:11-14, 21:5-8.)

Because of the noise commonly made by inmates in the Unit, attempts to gain the attention of the officers, including yelling and door kicking, are not generally helpful in alerting officers to an issue, such as Gonsalez's extended period of handcuffing, a reality Gonsalez acknowledged. (Ferguson Decl. ¶ 6; Gonsalez Dep. 19:10-15, 20:8-12, 21:10-19.) In addition, Unit cells have small windows about ten inches by ten inches, making it difficult to see the inmates in their cells without intentionally looking through the window. (Ferguson Decl. ¶ 6.)

Ferguson was working in the Unit that day and may have escorted Gonsalez to his cell. (Ferguson Decl. ¶ 5.) However, if Ferguson failed to remove the handcuffs from Gonsalez, he "did not purposefully leave him in handcuffs for about an hour for any reason, let alone for the purpose of punishing or mistreating him," and had he known Gonsalez remained handcuffed inside his cell for more than a few minutes, he would have removed the handcuffs. (Ferguson Decl. ¶¶ 5, 8.) Ferguson does not remember hearing any inmate, including Gonsalez, requesting help on Gonsalez's behalf. (Ferguson Decl. ¶ 6.)

Gonsalez identified Officer Turner as the officer that left him handcuffed and the one "who made the mistake." (Gonzales Dep. 58:17-59:5.) He named Ferguson as a defendant because he handcuffed him after the Incident when Gonsalez told him it hurt way too much. (Gonsalez Dep. 59:18-20.)

After the handcuffs were removed, Gonsalez requested medical attention, indicating his shoulder hurt, even though he did not appear to be in physical pain. (Ferguson Decl. ¶ 7.) Gonsalez testified Ferguson said "he was going to help me, but that he had to handcuff me again to be able to move me." (Gonsalez Dep. 18:15-17.) The Sergeant on duty in the Unit denied Ferguson's

PAGE 6 - OPINION AND ORDER

request to handcuff Gonsalez in the front during his escort for medical attention. (Ferguson Decl. ¶ 7.) Ferguson handcuffed Gonsalez in back but used two handcuffs to give Gonsalez additional movement to alleviate his pain. (Gonsalez Dep. 18:21-24.) An officer, possibly Ferguson, then escorted Gonsalez to another cell for examination by a nurse. (Ferguson Decl. ¶¶ 6, 7.)

## II. Medical Care

Before the Incident, Gonsalez had a history of right shoulder pain, had been referred to an outside specialist for a physical therapy evaluation on January 27, 2017, and on February 15, 2018, had been provided a year-long prescription for Mobic,[6] or meloxicam, which he used through at least September 2018. (Beamer Decl. dated August 9, 2019, ECF No. 43, ¶¶ 4, 5, 21, Attach. at 4, 31-37.) A member of the EOCI nursing staff examined Gonsalez the evening of the Incident, documented no new injury, swelling, or misalignment, and reported Gonsalez was able to "lift both extremities shoulder height." (Beamer Decl. ¶ 7, Attach. 1 at 9.) The nurse claimed Gonsalez received Tylenol and an ice pack, and was told to contact the medical staff if his symptoms persisted. (Beamer Decl. ¶ 7, Attach. 1 at 9.) Gonsalez testified the nurse came to his cell, asked him to lift his arm up, and then left after he reported he could not lift his right arm due to pain. (Gonsalez Dep. 27:2-8, 37:14-38:6.) Gonsalez said he did not get any medication or ice until the following morning, when a doctor visited and ordered x-rays. (Gonsalez Dep. 27:15-22.)

The next day, Gonsalez again complained of non-radiating pain from the top of his right shoulder. (Beamer Decl. ¶ 8, Attach. 1 at 9.) On June 5, 2018, Nurse Practitioner Ron Whitten-Bailey ("Whitten-Bailey") initiated the process to request an MRI for Gonsalez's right shoulder,

---

[6] "Mobic is a prescription nonsteroidal anti-inflammatory medicine used to treat the symptoms of osteoarthritis, rheumatoid arthritis and moderate to severe pain." https://www.rxlist.com/mobic-drug.htm (last visited September 1, 2020).

PAGE 7 - OPINION AND ORDER

which required the Therapeutic Level of Care Committee's ("TLC")approval. (Beamer Decl. ¶ 9, Attach. 1 at 3, 9.) The TLC authorized an appointment with William Bell, M.D. ("Dr. Bell"), and on June 28, 2018, Whitten-Bailey initiated a request for an "MR-A right shoulder" on Dr. Bell's recommendation. (Beamer Decl. ¶¶ 11, 12, Attach. 1 at 3, 25, 26.) The TLC approved the MR-A on July 10, 2018, based on a reported diagnosis of "labral tear to right shoulder, painful right shoulder, 'plus O'Briens, no laxity.'" (Beamer Decl. ¶ 14, Attach. 1 at 24.) After reviewing the results of the July 18, 2018 MR-A, Dr. Bell recommended, and Whitten-Bailey initiated a request for, a right "shoulder scope with debridement of Os acromiale," which the TLC approved on July 31, 2018. (Beamer Decl. ¶¶ 16 -18, Attach. 1 at 12-13, 19, 21.) The surgery to Gonsalez's right shoulder occurred on September 4, 2018, and Gonsalez participated in physical therapy from September 10, 2018, through November 2018. (Beamer Decl. ¶¶ 20, 23-26, Attach. 1 at 1, 5-7.) Gonsalez alleges he continues to suffer from pain and limited movement as a result of the injury to his shoulder. (Gonsalez Dep. 46:2-8.)

Dr. Beamer admits he ordered pain medication for Gonsales after the September surgery. (Beamer Decl. ¶ 29.) However, Dr. Beamer does not recall providing, and the record lacks evidence Dr. Beamer provided, medical care to Gonsalez between the date of the Incident and the September surgery. (Beamer Decl. ¶ 29.) Gonsalez named Dr. Beamer as a defendant because he is "in charge of all of the doctors that were able to help me" and he opined Gonsalez did not have anything wrong with his shoulder. (Gonsalez Dep. 60:22-61:6.)

III. Grievances

Gonsalez completed and submitted two grievance forms dated June 12, 2018, apparently related to the Incident, which were received by EOCI on July 17, 2020. (Sobotta Decl. dated August 8, 2019, ECF No. 44, Attach. 5 at 10, Attach 6 at 2.) Both grievance forms referred to an

PAGE 8 - OPINION AND ORDER

incident that occurred on May 31, 2018, but were not otherwise completed in English. (Sobotta Decl. Attach. 5 at 10, Attach. 6 at 2.)  Gonsalez sues Amsberry in her capacity as Superintendent in charge of the officers when Gonsalez filed his grievances, and on her failure to respond to communications Gonsalez sent to her after the Incident. (Gonsalez Dep. 59:22-60:21.)

### A. The '057 Greivance

One grievance form was assigned grievance number EOCI-2018-07-057 ("Grievance") and denied in a grievance response dated July 20, 2008 ("Response"). (Sobotta Decl. Attach. 5 at 9.)  The Response noted the Grievance alleged "Health Services did not provide medical attention for your complaint of arm pain on May 31, 2018," and denied the Grievance based on Gonsalez's history of chronic shoulder pain, the absence of evidence of any new injury, and Gonsalez's ability to carry items and lift his arms without difficulties when evaluated by a nurse shortly after the Incident. (Sobotta Decl. Attach. 5 at 9.)  The Response specifically found: "[T[he documentation shows that you received appropriate medical care" and "grievances are not the appropriate venue for financial compensation." (Sobotta Decl. Attach. 5 at 9.)

Gonsalez completed a grievance appeal form on July 27, 2018, again in a language other than English, which EOCI received July 30, 2018 (the "Appeal"). (Sobotta Decl. Attach. 5 at 8.) In the response dated August 24, 2018, C. DiGiulio, M.D., the Department's Medical Director ("Dr. DiGiulio"), noted the Appeal concerned "complaints of right shoulder pain on May 31, 2018 in which you allege that you 'need surgery due to not being tended to that day." (Sobotta Decl. Attach. 5 at 6.)  Dr. DiGiulio then noted Gonsalez was seen and treated for his right shoulder pain immediately after the Incident and was referred to an orthopedist who evaluated Gonsalez on June 28, 2018, and, after an MR-A, recommended surgery on July 26, 2018. (Sobotta Decl. Attach. 5 at 6.)  Dr. DiGiulio informed Gonsalez that "[s]urgical intervention for this condition is typically

PAGE 9 - OPINION AND ORDER

only recommended after non-surgical management has been tried" and acknowledged that "surgical treatment is pending." (Sobotta Decl. Attach. 5 at 6.) Dr. DiGiulio concluded the "documentation shows that you are receiving excellent care consistent with community standards," and he denied the Appeal. (Sobotta Decl. Attach. 5 at 6-7.)

Gonsalez filed a second appeal dated September 26, 2018, and received by EOCI on October 1, 2018 ("Second Appeal"). (Sobotta Decl. Attach. 5 at 3.) The Second Appeal was completed in English and alleged as inadequate the medical treatment he received from the nurse on May 31, 2018. (Sobotta Decl. Attach. 5 at 3.) Gonsalez complained about the medication provided, noting it was only Tylenol, and about having to wait until the next day to receive ice. (Sobotta Decl. Attach. 5 at 3.) He also complained about the delay in scheduling surgery and the nurse's failure to remove the "patches or goses" for ten days after the surgery. (Sobotta Decl. Attach. 5 at 3.) He requested medical care to avoid future issues with his shoulder and monetary compensation in the event his shoulder did not return its pre-Incident condition. (Sobotta Decl. Attach. 5 at 3.) EOCI accepted the Second Appeal and forwarded it to the Department for response on October 3, 2018 ("Second Appeal"). (Sobotta Decl. Attach. 5 at 4-5.) On November 1, 2018, J. Bugher, the Department's Health Services Administrator ("Bugher"), denied the Second Appeal for reasons substantially similar to those outlined in the Response, and he encouraged Gonsales to "follow the provider recommendations and avoid situations that put you at risk of injury." (Sobotta Decl. Attach. 5 at 1-2.)

### B. The '058 Grievance

The other grievance form received grievance number EOCI EOCI-2018-07-058, and was returned to Gonsalez on July 19, 2020, with the explanation that: "An inmate grievance may request review of just one matter, action or incident per inmate grievance form." (Sobotta Decl.

Attach. 6 at 2.) Gonsalez did not submit a response or corrected grievance but, instead, filed a third grievance form in August 2018, in which he complained about the one-grievance-per-issue rule and claimed the "process fails to process complaints based on negating the purpose for access to courts and fails to follow department of correction rules." (Sobotta Decl. Attach. 4 at 1, Attach. 7 at 5.) EOCI denied the third grievance. It again explained a "grievance complaint can have one issue and one staff," encouraged Gonsalez to familiarize himself with the process to ensure successful outcomes in the future, and assured him that "the grievance process at the institution level has nothing to do with denying court access." (Sobotta Decl. Attach. 7 at 1.)

## Legal Standard

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2019). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2019). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

## *Discussion*

### I.  The Incident

Gonsalez appears to allege the officers' failure to remove his handcuffs for more than an hour constituted cruel and unusual punishment and violated his Eight Amendment rights. Defendants attack this claim based on Gonsalez's failure to exhaust his administrative remedies and because they are entitled to qualified immunity. Alternatively, they seek Amsberry's and Dr. Beamer's dismissal because no evidence shows their personal involvement in the Incident.

#### *A.  Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act (the "Act") requires a prisoner to exhaust all available administrative remedies before filing a Section 1983 action in federal court regarding prison

conditions. *Griffin v. Arpaio*, 557 F.3d 1117, 1119 (9th Cir. 2009) (citing 42 U.S.C. § 1997(e)(a)). Exhaustion must be proper, meaning the "grievant must use all steps the prison holds out, enabling the prison to reach the merits of the issue." *Griffin*, 557 F.3d 1119.  In other words, the prisoner must comply with the prison grievance system's "critical procedural rules," and must appeal the grievance to its highest level within the grievance system prior to filing a lawsuit. *Woodford v. Ngo*, 548 U.S. 81, 95 (2006).

Failure to exhaust is an affirmative defense that must be raised by a defendant, who bears the burden of proving the absence of exhaustion. *Jones v. Bock*, 549 U.S. 199, 211-12 (2007); *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003).  To meet this burden, the defendant must establish the existence of "an available administrative remedy and that the prisoner did not exhaust that available remedy." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014).  Once the defendant has carried that burden, the prisoner must provide evidence showing the existing and generally available administrative remedies were effectively unavailable to him by showing, for instance, that prison officials declined to hear the merits of a grievance or obstructed the prisoner's attempts to exhaust. *Id.* at 1172-1173.

The prisoner must exhaust all available remedies, even if the remedies are not "plain, speedy, and effective," and even if the prisoner seeks relief not available in grievance proceedings, such as money damages.  *Porter v. Nussle*, 534 U.S. 516, 524 (2002) (Act's exhaustion requirement applies to all prisoner suits about prison life, whether challenging general circumstances or particular episodes and whether alleging excessive force or some other wrong). When a prisoner has not exhausted nonjudicial remedies, the court should dismiss the claim without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003).

The Department has established internal grievance and appeal procedures through which inmates may seek formal review of a complaint regarding any aspect of his confinement. These procedures govern inmate complaints relating to, in part: "[t]he misapplication of any administrative directive or operational procedure;" "[a]ny unprofessional behavior or action which may be directed toward an inmate by an employee, contractor, or volunteer of the Department;" or "[a]ny oversight or error affecting an inmate[.]" OR. ADMIN. R. 291-109-0140(2) (2019). The grievance process is explained in the inmate handbook. (Sobotta Decl. ¶ 5.) Furthermore, grievance instructions are available with grievance forms, which may be obtained from unit housing officers. (Sobotta Decl. ¶ 5.)

Inmates are encouraged to first address their concerns with Department staff through informal written or verbal communication. OR. ADMIN. R. 291-109-0100(3)(a) (2019). If informal resolution is unsuccessful, an inmate may initiate a grievance by filing an approved inmate grievance form within thirty days of the incident giving rise to the grievance. OR. ADMIN. R. 291-109-0140(1), 0150(2) (2019). An inmate unsatisfied with the initial grievance response may appeal to the functional unit manager within fourteen days of receiving the grievance response. OR. ADMIN. R. 291-109-0170(1) (2019). If the first appeal is denied, an inmate can appeal the functional unit manager's decision to the Assistant Director, whose decision is final and not subject to further administrative review. OR. ADMIN. R. 291-109-0170(2) (2019).

Gonsalez alleged the Department grievance procedure covered his claim for "medical deliberate indifference" and that he exhausted his administrative remedies. (Compl. ECF No. 2, at 6-7. The record evidence establishes Gonsalez did grieve and exhaust the grievance procedure with regard to his deliberate indifference claim, but no evidence shows Gonsalez ever filed a grievance based on the failure to remove his handcuffs for more than an hour. Although many of

PAGE 14 - OPINION AND ORDER

Gonsalez's grievance forms were completed in a language other than English, thereby preventing the court from determining if Gonsalez included a claim based on the Incident, EOCI and Department staff identified the grievances as a "medical grievance" and handled them accordingly. In the absence of contrary evidence, the court finds Gonsalez failed to exhaust, or even initiate, his administrative remedies the Incident. Accordingly, Gonsalez is barred from litigating his cruel and unusual punishment claim at this time.

## B. Lack of Personal Involvement

Even assuming Gonsalez exhausted his administrative remedies regarding his cruel and unusual punishment claim, he has not established Amsberry's and Dr. Beamer's personal involvement in that claim. Liability under § 1983 must be based on a defendant's personal participation in the alleged deprivation of constitutional rights. *Barron v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). A cognizable claim under Section 1983 also requires plaintiff to show causation, or that a particular defendant engaged in "'an affirmative act, participat[ed] in another's affirmative act, or omit[ted] to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)); *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988).

To establish causation, a plaintiff must provide evidence of each individual defendant's causal role in the alleged constitutional deprivation. *Leer*, 844 F.2d at 634. Accordingly, when determining causation, a court "must take a very individualized approach which accounts for the duties, discretion, and means of each defendant." *Id.* at 633-34. Similarly, "[a] supervisor is only liable for the constitutional violations of . . . subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them." *Taylor v. List*,

PAGE 15 - OPINION AND ORDER

880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Nor does *respondeat superior* liability exist under § 1983. *Taylor*, 880 F.2d at 1045.

Gonsalez fails to present evidence Amsberry and Dr. Beamer were personally involved in the Incident or in any constitutional violations resulting therefrom. In fact, Gonsalez testified at his deposition he named Amsberry and Dr. Beamer as defendants because they were "in charge" – the supervisors – of the officers or doctors who were involved. He also complained that Amsberry did not respond to his communications and that Dr. Beamer found nothing wrong with his shoulder, but these allegations are unrelated to the Incident and fail to establish the requisite causal connection between Amsberry's and Dr. Beamer's conduct and the injuries resulting from the Incident. Consequently, Gonsalez fails to establish a viable cruel and unusual punishment claim against Amsberry and Dr. Beamer, and they are entitled to summary judgment.

### C. *Qualified Immunity*

Nor does the alleged conduct rise to a constitutional violation, or a violation of a clearly established constitutional right, thus entitling Defendants to qualified immunity on this claim. Qualified immunity protects "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Therefore, public officials generally are immune from civil liability unless their actions violated clearly established law, because "a reasonably competent public official should know the law governing his conduct." *Id.* "The qualified immunity standard gives ample

PAGE 16 - OPINION AND ORDER

room for mistaken judgments by protecting all but the plainly incompetent of those who knowingly violated the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (citation and internal quotations omitted).   The key inquiry in determining whether a public official should not enjoy qualified immunity is whether he or she had "fair warning" their alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 739–40 (2002).

To determine whether the doctrine of qualified immunity applies to individual defendants, the court must decide whether a plaintiff has shown violation of a constitutional or statutory right and whether the right at issue was "clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).   Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223 236 (2009).   The "clearly established" inquiry "must be undertaken in the light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

Officials may be held liable only for violation of a right the "contours [of which are] sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Id.* at 202.   Therefore, "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Id.* To be clearly established, the law need not be a "precise formulation of the standard" where "various courts have agreed that certain conduct is a constitutional violation under facts not distinguishable in a fair way from the facts presented in the case at hand." *Id.*

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. CONST. amend VIII.   "The Constitution 'does not mandate comfortable prisons,' but neither does

it permit inhumane ones, and it is now settled that 'the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations omitted). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828. A prison official violates the Eighth Amendment when two requirements are met. *Id.* at 834. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The second requirement follows from the principle that 'only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.'" *Id.* (quoting *Wilson*, 501 U.S. at 297).

Gonsalez alleges Defendants' failure to remove his handcuffs for more than one hour violated the Eighth Amendment, but courts have held the handcuffing of an inmate for much more than one hour did not subject an inmate to a substantial risk of serious harm. The Ninth Circuit recently held that leaving an inmate in handcuffs in a law library pending return to his cell did not put the inmate at substantial risk of suffering serious harm where inmate failed to complain the restraints were too tight. *Brown v. Trejo*, No. 18-56603, 2020 WL 3057422, at *1 (9th Cir. June 9, 2020). Similarly, in *Key v. McKinney*, 176 F.3d 1083, 1086 (8th Cir.1999), the Eight Circuit held keeping an inmate in handcuffs and leg shackles for twenty-four hours did not result in a "serious deprivation of 'the minimal civilized measure of life's necessities,'" where the inmate was not deprived of bedding, food, or bathroom facilities and was checked on at regular intervals. And an Illinois district court held the handcuffing of inmates behind their backs for eight to nine hours during a shakedown, "given the security concerns and unique circumstances surrounding the execution of the shakedown, was not the kind of serious deprivation which would be actionable under the Eight Amendment." *Hernandez v. Battaglia*, 673 F. Supp. 2d 673, 677 (E.D. Ill. 2009).

The court finds leaving Gonsalez in handcuffs for more than one hour in light of Gonsalez's failure to complain the handcuffs were too tight, and while he retained the ability to move freely about his cell and lay down on his bed, and was not otherwise ill or threatened with risk of harm, did not amount to a sufficiently serious deprivation to support his Eighth Amendment claim alleging based on the Incident.

Furthermore, Gonsalez has failed to present evidence the failure to remove his handcuffs was "wanton." The general deliberate indifference standard applies to Eighth Amendment cases where an inmate is challenging conditions of confinement in a non-emergent situation. *Johnson v. Lewis*, 217 F.3d 726, 733 (9th Cir. 2000). This standard "requires the plaintiff to prove that 'the official knows of and disregards an excessive risk to inmate health or safety.'" *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Gonsalez admits the Unit was busy and very noisy, and it was likely no one heard him call for help. Once the other inmates joined in getting the officers attention, the officers quickly removed the handcuffs. Ferguson stated he did not intentionally leave Gonsalez handcuffed in his cell, and would have removed the handcuffs had he known Gonsalez remained handcuffed inside his cell for more than a few minutes. On this record, the conduct does not meet the Eight Amendment's intentional disregard standards applicable to prison conditions.

Similarly, Ferguson did not act with deliberate indifference or subject Gonsalez to serious risk when he handcuffed Gonsalez after the Incident. To the contrary, Ferguson asked for permission to handcuff Gonsalez in the front and, when such permission was denied, used two handcuffs to alleviate the pain suffered by Gonsalez as a result of handcuffing in the back. Furthermore, Ferguson handcuffed Gonsalez after the Incident for security reasons; he was transporting Gonsalez to another cell, a short-lived task.

PAGE 19 - OPINION AND ORDER

The court finds Gonsalez failed to establish Defendants' conduct with regard to the Incident violated his Eighth Amendment rights. Consequently, Defendants are entitled to summary judgment on this claim. Alternatively, assuming a constitutional or statutory right has been violated, the right at issue was not "clearly established" at the time of the Incident and Defendants are entitled to qualified immunity with regard to Gonsalez's claim.

## II. Medical Care

Gonsalez also alleges Defendants failed to promptly and appropriately treat the injury to his shoulder suffered as a result of the Incident. Defendants move for summary judgment on this claim, arguing Gonsalez filed his lawsuit before exhausting his administrative remedies, that there is no evidence Defendants were personally involved in Gonsalez's medical care predating the surgery, and that Dr. Beamer did not act with deliberate indifference.

### A. Exhaustion of Administrative Remedies

Gonsalez filed this lawsuit on October 18, 2018, after he submitted his Second Appeal but before Bugher's November 1, 2018 denial. Consequently, Gonsalez filed his lawsuit before exhausting his administrative remedies, and his claim for deliberate indifference of medical needs could be dismissed without prejudice for this reason alone. Because Defendants also argue the merits of Gonsalez's deliberate indifference claim, and to avoid an attempt by Gonsalez to restate this claim in a new lawsuit, the court elects to consider, and resolve, Gonsalez's deliberate indifference claim on the merits.

### B. Lack of Personal Involvement

Gonsalez alleges Defendants failed to promptly, and adequately, address the injuries to his shoulder after the Incident. Gonsalez's claims against Ferguson are limited to his possible involvement in the Incident and in handcuffing Gonsalez for escort to another cell so he could be

PAGE 20 - OPINION AND ORDER

examined by medical staff. His claims against Amsberry are based on her capacity as supervisor and her failure to respond to his communications. It is evident from the allegations and the evidence before the court that neither Ferguson or Amsberry were personally involved in the provision of, or failure to provide, medical care to Gonsalez and, as such, they are entitled to summary judgment on Gonsalez's claim for deliberate indifference to his medical needs. Dr. Beamer is entitled to summary judgment on this claim because he is not liable in his alleged supervisory capacity over other Department medical staff and because of a lack of personal involvement in the alleged constitutional violations.

### C. Deliberate Indifference

Deliberate indifference toward a medical need is established in the Ninth Circuit by showing: (1) a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain[;]' "and (2) defendant's response to the need was deliberately indifferent. *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1991) (*quoting Estelle v. Gamble,* 429 U.S. 97, 104 (1976), *overruled on other grounds by WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir.1997) (*en banc* ). The second prong is satisfied by showing: (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need; and (b) harm caused by the indifference. *Id.* Indifference "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id.* at 1059. An "inadvertent [or negligent] failure to provide adequate medical care" alone does not state a claim under § 1983. *Id.*

Based on the record evidence, Dr. Beamer was not involved with Gonsalez's medical care from the date of the Incident through the date of the September 2018 surgery. Thereafter, Dr.

PAGE 21 - OPINION AND ORDER

Beamer merely prescribed pain medication for Gonsalez and opined nothing was wrong with his shoulder. This conduct does not establish Dr. Beamer failed to treat Gonsalez's pain or possible medical need, or that such failure was intentional or indifferent. Thus, Gonsalez fails to establish Dr. Beamer violated his constitutional rights under the Eighth Amendment, and Dr. Beamer is entitled to summary judgment on this claim.

*Conclusion*

Defendants' motion (ECF No. 40) for summary judgment is GRANTED.

DATED this /2*th* day of September, 2020.

JOHN V. ACOSTA
United States Magistrate Judge

PAGE 22 - OPINION AND ORDER